J. A. INGLIS, Respondent, v. N. A. FLOYD, Appellant.

Kansas City Court of Appeals, February 4, 1889.

1. **Partnership**: MORTGAGE OF PARTNER'S INTEREST DOES NOT OPER-
ATE AS A DISSOLUTION. I., a partner in a jewelry firm executed,
acknowledged and delivered an instrument in writing, whereby
he granted, sold, assigned and set over to his co-partner F. all his
right, etc., in and to a stock of jewelry, etc., which instrument
recites that F. had made advances to the firm and would be com-
pelled to make further advances to the firm to meet its indebted-
ness, and gave I. ninety days to pay F. said advances; and said
instrument further empowered said F. to sell the stock immedi-
ately at private sale, in the usual course of business, or in any other
way, for the purpose of paying off the indebtedness of the firm,
and the sums of money due from I. to F., etc., and apply the pro-
ceeds to the purpose aforesaid, and the expenses of selling the
same, etc. And thereupon F. took exclusive possession of the
business and excluded I. from all participation in and access to
the business. *Held* that the instrument is merely a chattel mort-
gage, and did not have the effect to dissolve the partnership.

2. ———— : ———— : EXCLUSION FROM BUSINESS: GROUND FOR DISSOLU-
TION : ACTION NOT PREMATURE. I.'s bill to dissolve the partner-
ship and for an accounting on the ground of such exclusion brought
eight days after the execution of the mortgage, and before the
ninety days provided for therein for the redemption had expired, is
not premature.

3. ———— : ACCOUNTING : EVIDENCE AS TO AMOUNT REALIZED : CARE
AND DILIGENCE OF TRUSTEE. Equity enjoins upon trustees and
others occupying a fiduciary relation, the obligation to use reason-
able care and diligence in the discharge of their functions, and in
accounting, the offer of a partner to show what he actually realized
for partnership property is not admissible unless coupled with a
showing of reasonable care and diligence, as there may be a wide
difference between the amount actually realized and the amount
that might have been realized by the use of such care and dili-
gence.

Inglis v. Floyd.

4. ——— : ———— : EXPENSE IN CLOSING BUSINESS ALLOWED. A partner is not entitled to compensation for conducting business, but is entitled to charge the partnership with sums *bona fide* expended in so doing, and the refusal of the trial court to permit defendant to show such expense, is erroneous.

5. ——— : ———— : SETTLEMENT : PLEADING AND EVIDENCE. In an accounting, where defendant pleads in avoidance of plaintiff's action a full and a complete settlement between them of all their co-partnership affairs he will not be permitted to introduce evidence going behind such alleged settlement to establish a fact embraced therein.

6. **Appellate Practice :** ERROR ON FACE OF RECORD : REVERSAL. If error appears upon the face of the record of the finding and decree of the trial court, the judgment will be reversed.

*Appeal from the Jasper Circuit Court.*—HON. JOSEPH CRAVENS, Special Judge.

REVERSED AND REMANDED.

*J. D. Perkins* and *Thomas & Hackney*, for appellant.

.(1) The assignment, executed by respondent to appellant, October 26, 1883, which was held valid by the trial court, constituted a dissolution of the firm. *Spaunhorst v. Link*, 46 Mo. 199 ; Story on Part., sec. 310. (2) Provision for the settlement of the partnership affairs having been made by the parties themselves in the assignment executed to appellant, the respondent had no right of action for an account till appellant had an opportunity to act under the assignment. Hence, respondent's suit, begun eight days after the execution of the assignment, was premature. *Quinlivan v. English*, 44 Mo. 51. (3) The court committed error in excluding the evidence offered by appellant as to the amount of expenses paid by him in closing out the partnership business, and in refusing to allow him for the same. The assignment expressly provided for an allowance of expenses, and the law, independent of such stipulation, would entitle him to such allowance. Lindley on Part. 777 ; *Pierce v. Cuberly*, 19 Ind. 157; *Foster v. Goddard*, 1 Black. 506 ; *Burleigh v. White*, 70 Me. 130 ;

*Withers v. Withers*, 8 Pet. 355; *O'Reiley v. Brady*, 28 Ala. 530. (4) The court excluded evidence offered by appellant, showing what he actually realized out of the partnership property, and charged appellant with full value of the goods as invoiced on the day he took sole charge under the assignment. This was error. *Moore v. Huntington*, 17 Wall. 417; *Rowe v. Wood*, 2 J. & W. 556. (5) The court erred in excluding the evidence offered by appellant as to the value of the Peirce City stock. The appellant in his answer raised the issue of a fraudulent over-valuation by Sol. Bauman, and asked for an off-set of the amount paid by him in excess of the true value of one-half the stock. (6) Error apparent on the face of the judgment itself was committed by the court. There is a finding that defendant received ten thousand dollars in stock and three hundred dollars in accounts; and afterwards the judge computed the amount to be thirteen thousand dollars in stock and accounts. It is evident that the judge committed a very serious clerical error in raising the amount from three hundred to three thousand dollars.

No brief for respondent.

SMITH, P. J.—This was a suit in equity having for its object the cancellation of a chattel mortgage, the dissolution of a partnership, and for an accounting between partners. The petition alleged that plaintiff and defendant entered into a contract of co-partnership by which it was agreed that they would engage in the jewelry business for the term of three years; that said business was carried on for some ten months under the management of the plaintiff, at the expiration of which time he fell sick and by reason thereof relinquished the management of said partnership business; that while he was enfeebled by disease and wholly unable to understand or transact business of any kind the defendant, by false representations and in a fraudulent manner,

procured from him a chattel mortgage whereby he con-
veyed to defendant all his interest in the partnership
property ; that thereupon defendant took the exclusive
possession of the partnership property and accounts,
pulled down the sign of the firm, changed the lock on
the store-door to more effectually exclude plaintiff
therefrom, gave notice that plaintiff had no right or
interest therein and refused to permit plaintiff in any
manner to participate in the management of the part-
nership business or to consult or advise with plaintiff
respecting the same ; that the defendant was fraudu-
lently disposing of the partnership property, retaining
dishonest employes who were filching the money and
goods from said store, and was not keeping an account
of sales nor cash received. There were other acts of
gross misconduct charged against defendant in the peti-
tion which need not here be repeated.

The answer, after denying the allegations in the
petition, states that the bill of sale, called a mortgage
in the petition, was given for the purposes it mentions,
without fraud ; that at the time of the execution thereof
said firm was largely indebted to defendant for money
advanced by him for it over and above his equal and
just share ; that plaintiff was further indebted to him
in this : that by the terms of their said articles of co-
partnership it was agreed that the defendant was to pay
plaintiff one-half of the appraised value of the stock of
jewelry then owned by plaintiff and that said appraise-
ment was to be made by a disinterested jeweler; that
plaintiff represented one Sol. Bauman to be a disinter-
ested jeweler and thereby induced defendant to agree
upon him to appraise the same ; that said Bauman was
not a disinterested jeweler, and that he and plaintiff,
intending to cheat and defraud defendant, conspired
together for that purpose, and in furtherance thereof
said Bauman fraudulently appraised said stock at the
sum of thirty-six hundred dollars in excess of the true

value of one-half of the same, and to secure this amount, with other considerations, said bill of sale was executed ; that plaintiff brought suit against defendant for said excessive valuation, and pending the same they made a full and complete settlement of all the matters and things in controversy between them, etc.

The replication was a general denial.

At the trial the plaintiff introduced the articles of co-partnership by which plaintiff and defendant entered into co-partnership as equal partners in the business of buying and selling jewelry, etc.

J. A. Inglis testified : " Am plaintiff. I procured articles of co-partnership, brought the stock of jewelry from Peirce City, January 1, 1883. Invoice amounted to $5,560 as shown by book. It was made by Sol. Bauman. We agreed on him. All the stock was moved here. I received from Floyd $2,780. We were in busi-. ness up to October, 1883. ⸱ I kept part of the accounts, Floyd part, and his son part. The books show that in addition to the goods we brought from Peirce City, we bought goods to the amount of $12,251.53. Part of the money I got from Floyd I paid to Sol. Bauman on pre-vious indebtedness of mine to him. When I went out of the firm, the firm owed $6,282.40 for goods bought up to that time; the total amount of goods bought by the firm, including the stock brought from Peirce City, amounted to. $17,711.53. We kept an account of the daily sales. The book shows that the total amount of sales—cash and credit—up to October 25, 1883, amounted to $6,046.40, and total expense account up to October 24, 1883, $1,286.19. At the time I was taken sick, I think the firm had two hundred dollars or two hundred and fifty dollars cash in bank. On October 26, 1883, Floyd drew out of bank on firm account $216.19. On October 26, 1883, bills were due amounting to $780.50. The firm owed other accounts and notes, which were not due at that date. We owed Sol Bauman a

note of $397, dated September 3, 1883, due in two months, and two more notes of same date due in three months, aggregating $1,194. At time I executed bill of sale to Floyd I had been sick two or three weeks and away from the store. Floyd and his son were in charge of the store during that time. While I was in charge of store, Floyd's son, eighteen years old, was with me. Neither Floyd nor his son had any experience in the business, except that Floyd had been a merchant. On day I executed instrument under which Floyd took sole possession of stock, Floyd and his attorney said that it was all right, and was for the best interest of the business. I was in bed. Was raised up to sign it by Mr. Green. He put the pen in my hand. I was very bad. They never said anything to me about selling my interest. After I got on my feet I went to the store and found them taking an invoice. I asked defendant what it meant, and he said I had no interest in it; that I had sold out by the instrument I had executed. The sign was taken down, the combination on the safe was changed, and goods being re-marked. This was about one week after the execution of the bill of sale. I was not permitted to go into the store or to have anything to do with the business. There was due the firm October 26, 1883, account of goods sold, the sum of $349.20.''

Cross-examination : '' When I signed the bill of sale Mr. Green, Mr. Floyd and Mr. Stickney were present. Don't remember whether it was read to me or not. Green said it was all right, and for the benefit of the firm, and told me to sign it, and put the pen in my hand and I signed it. I am satisfied Thomas, Floyd and Dr. Cormack were not there on the day before. All the indebtedness I know of is that entered in the merchandise book. The account of S. Ambe & Co. was not due. Don't know that we got statements from them claiming that it was due. Their bill was dated June 4, 1883, on sixty days time, payable in four months. Merchants'

taxes for city and county had not been paid. I may have received this letter of December 12, 1883, of Sol. Bauman & Co. We were indebted to Bauman over twenty-three hundred dollars on October 26, 1883. It was not all due at time suit was brought. Goods were bought on six months time. All except one hundred and ninety dollars were bought before May 1, 1883, and all bought prior to June 1, 1883, except $11.20. I paid account of Epstein for mounting, $89.25, October 8, 1883, by check of firm. I never kept my accounts on books of firm of goods I got out of store. I kept my account in a private book, and Floyd's account in same book."

Re-direct examination: "Floyd had been in exclusive control of stock of goods for two or three weeks on October 26. Floyd never saw my private account-book. On October 26, 1883, I owed Reed notes for sewing-machines which have not been paid, but are secured by chattel mortgage on furniture."

Plaintiff then introduced in evidence the original assignment in this case, in words and figures as follows: "Know all men by these presents, that J. A. Inglis, of Carthage, Mo., in consideration of one dollar paid to him by N. A. Floyd, of the same place, the receipt whereof is acknowledged, has granted, sold, assigned and set over, and does hereby sell, assign, and set over unto N. A. Floyd, all the right, title and interest of said J. A. Inglis, in and to the stock of jewelry, watches, clocks, safe, show-cases, fixtures and all other goods, wares, chattels and merchandise, belonging to the firm of Inglis & Floyd, in the store-room of W. H. Smith, on the east side of the public square, in Carthage, Mo., upon the conditions following: Whereas, the said Floyd has advanced for the use of said firm money in excess of his share, and said Inglis is also indebted to said Floyd on other accounts; and, whereas, the firm is now largely indebted, and said J. A. Inglis is unable to raise and provide his share of the funds to pay off this indebtedness, and said N. A. Floyd will be compelled to furnish

all the funds for the payment of said indebtedness of said firm, therefore, if said J. A. Inglis shall, within ninety days from this date, pay to said Floyd all sums of money now due to him on account of money advanced to said firm aforesaid, in excess of his just share, and all sums due and owing said Floyd on any other account, and all sums of money which said Floyd may hereafter pay or otherwise advance to the firm in excess of his just share, and together with ten per cent. interest on all sums now due or to become due from the time the same become due, or from the time such money is advanced, then this conveyance to be void; otherwise to remain in full force and effect. And the said N. A. Floyd is empowered to sell the said property immediately at private sale in the usual course of business or in any other way for the purpose of paying off said indebtedness of the firm,. and the sums of money so due from said Inglis to said Floyd on account of money already advanced to said firm or on any other account, and on account of money which may be hereafter advanced as aforesaid, and apply the proceeds to the purposes aforesaid and to the expense of selling the same, and to the settlement of all the differences and damages due or coming to said Floyd on account of such goods bought of said Inglis. In witness whereof the said J. A. Inglis has set his hand and seal this twenty-sixth day of October, 1883. J. A. INGLIS. [Seal],''--which was properly acknowledged and recorded.

Several of the defendant's witnesses state that they were acquainted with the value of the goods invoiced. They were asked what was the difference, if any, between the invoice price of said goods and their actual value. There were several other questions asked of these witnesses covering substantially the same ground. To all these questions objections were interposed and by the court sustained and to which exceptions were taken.

A. L. Thomas testified : "I am an attorney at law.

Inglis v. Floyd.

Reside in Carthage.   Know plaintiff and defendant. Previous to October, 1883, I had done business for Mr. Floyd and probably for Mr. Inglis.   I was at Mr. Inglis' house on the day previous to the day on which the assignment was executed.   We were at the door probably five minutes before we got in, and went to his room and found him in bed.   Floyd was with me, and told him that some of the creditors were pushing for their debts and there was only a small amount of money on hand to pay them and that he, Inglis, had been buying large bills of goods without Floyd's knowledge, contrary to the terms of the agreement.   Floyd had some of the bills with him and asked Inglis what they would do to meet these pressing debts.   Inglis told him he had no money and could not raise money to meet his portion of the indebtedness.   Floyd complained to him that he could not get to see him and that he, Inglis, was dodging his responsibilities ; that he ( Floyd ) was solvent and would have to meet these claims, and wanted Inglis to meet his share.   Inglis said he could not do it ; that all his available interests were in the stock of goods, and that he was willing to turn over his interest in the stock or to fix it in any way to secure the claims ; and it was finally agreed that such an instrument as was drawn should be drawn up.   I had known Inglis for some years and he was in possession of all his mental faculties, his mind was clear, as much so as at any time I have ever seen him.   Floyd told him he wanted his individual indebtedness secured and he said he was willing to do it.   It was agreed that I should draw up a written instrument, giving him ninety days in which to raise the money. Inglis told me to write up the instrument just as you find it here, and send some one up to take his acknowledgment of it and he would sign and acknowledge it. He seemed to understand everything perfectly.   I was present at the application before Judge McGregor for the appointment of a receiver.   Inglis swore he had no recollection of signing the assignment, or of Floyd,

Green and Stickney, or myself, being there.   Said it was all a blank to him.   I think on the ninetieth day after execution of instrument, Floyd and I met Inglis on the street.   He was told that the ninety days were up, and for him to go over to the store with Floyd and go over the books and accounts with him and find how much had been paid and pay up his portion and come back into the firm as he had been.   Inglis said he had no money to pay it up, and it was in the court, and let the court settle it."

Cross-examination :   "There   was   no   figuring done ; it seemed to be taken for granted that Inglis was indebted to Floyd and that the firm was largely indebted. Think Dr. Cormack was there while we were.   Floyd said   Inglis   had   bought · large   bills   of   goods   in   his absence   which   they   could   not   sell,   and   the   firm   was in   debt   all   the   stock   was   worth.     Inglis   seemed   to understand   more   about   the   business   than   Floyd   did, as he had been in charge of the business in the store and Floyd   had   been   absent.     Inglis   opened   the   ball   by bringing this suit, and after that I brought a suit for Floyd against Inglis on the two hundred dollar note."

W. T. Green testified :   "I am an attorney at law. Reside in Carthage.   In October, 1883, Mr. Thomas and I were partners.   The assignment was executed at Mr. Inglis' house in the presence of Floyd, Stickney and myself.   Inglis was in bed when we got there ; his mental condition was as good as usual so far as I could discover.   I took Mr. Stickney, a notary public, and went to Inglis' house ; went to his room and spoke to him about how he was feeling.   I said :   'I suppose you know what we came here for.'   He said he did.   I told him I had the instrument as prepared by Mr. Thomas according to the agreement, and read it to him carefully. He first refused to sign it, but after talking the matter over, he said he would sign it, and spoke to his wife and she brought in a book or something to write on and he

signed it. I was present at the application before Judge McGregor for a receiver and heard Inglis testify. He testified he had no recollection of Floyd, Stickney and myself being at his house on the day he signed the instrument and that he had no recollection of Thomas or Floyd being there the day before."

R. T. Stickney testified: "I am the notary who took Inglis' acknowledgment to the assignment in evidence. Green read the instrument over to Inglis and he signed and acknowledged it before me."

N. A. Floyd testified: "Am defendant. Before the twenty-sixth day of October, 1883, there was a large amount of debts due by the firm for goods bought, and our creditors were pressing their claims for collection. The firm had no money to pay these debts, and sales of goods could not be made fast enough to meet them. I went with A. L. Thomas to see Inglis at his house October 25. He talked as rational as he ever talked. I told him about the debts being pressing, and told him of one case in which he had sent a check and it had been returned because we had no money in the bank on which it was drawn. I told Inglis he must furnish his share of the money to pay these debts, and he said he had no money. I told him if he would turn his interest in the stock over to me, and let me manage the business entirely, I would furnish the money to pay the debts. He said he would. It was then agreed that he was to turn the stock over to me and I was to go to work and pay off the debts of the firm, and Inglis was to have ninety days to repay me and get back his interest. Thomas told him he would draw up the assignment and send it down next day. Next day Green, Stickney and I went down to Inglis' house again. He was in about the same condition, and talked same as usual. Green told him he had brought the instrument for him to sign, and he refused to sign it. Said he did not like to sign his property away. I told him he had agreed to sign it, and if he wasn't going to

sign it, we would leave. After talking it over a while, he signed and acknowledged the instrument. I then took exclusive control of the business, under the assignment, borrowed money, and paid firm debts that were due and others as fast as they became due. By the time the ninety days were up, I had paid firm debts amounting to about five thousand dollars. Prior to October 26, 1883, I paid out of my own money, for the firm and on firm debts, the sum of $1,170.07. The books were kept by Inglis. I did not know of all the indebtedness of the firm. When I took possession of the store on October 26, 1883, the indebtedness amounted to $9,-569.77. Since that time I have paid all the firm indebtedness.''

Defendant's attorney then asked the following question : '' What expense were you at in selling the goods and running the business from the time you took charge of the goods under the assignment until you finished paying all the debts of the firm ?'' Plaintiff objected to said question and the court sustained the objection, to which ruling defendant duly excepted at the time.

Defendant's attorney then asked the following question : Q. '' How much did you realize from the sale of the partnership property on hand October 26, 1883, and from the old firm accounts ?'' Plaintiff objected to said question and the court sustained the objection, to which ruling the defendant duly excepted at the time.

Defendant then offered to prove that the defendant received only the sum of $7,250 from said property, which offer was rejected by the court, and said evidence was excluded. To which ruling defendant duly excepted at the time.

'' I was down to see Inglis two or three times before he executed the instrument. He was in bed sometimes and sometimes not. I did not feel disposed to put my

own money in the firm and take chances of getting it back, without having it secured in some way.   I desired to get exclusive control of the business so that the firm property might be used to pay firm debts, and pay me for my advances, and not be squandered; also that Inglis might not be able to incur any further indebtedness on behalf of the firm.   Inglis had, in my absence, bought large bills of high-priced and unsalable goods, without my knowledge and contrary to the articles of co-partnership, and I wanted to stop him.   At end of ninety days I invited Inglis to come over and examine books and see for himself what I had received and paid out, and to pay up and come into the firm.   He said he had no money to pay up, and the matter was in court, and let the court settle it.   I had not figured on how much was coming to me, as I thought we could do that when he got ready to pay."

Defendant then introduced in evidence the deposition of Dr. W. A. Cormack, in which he testified as follows:   "I reside at Cherry Vale, Kansas.   Am a practicing physician, and have practiced medicine for about twenty-five years.   I resided at Carthage, Mo., from February, 1882, to August, 1885.   Was called to see plaintiff in October, 1883.   When I first examined him I was at loss to know what ailed him, and told him I would call again.   When I called again there were no greater deviations from the laws of health than there were before, but he complained of pains under the right shoulder-blade ; but the pulse, respiration and temperature still remained normal.   To satisfy him I gave him a small opiate and told him I would call again, and I still could not discover any deviation from a physiological condition as regards the secretions, respiration, pulse and temperature.   I became satisfied he was feigning these troubles and I quit visiting him. During my entire treatment of and attendance upon plaintiff I discovered no delirium or other feebleness of

mind.   Had there been any delirium or other serious mental disorder I certainly would have detected it, and I am satisfied there was no such disorder."

Upon substantially the foregoing evidence the finding and decree of the court was as follows :  " Now, at this day, this cause comes on for hearing, the parties appearing by their attorneys, and all and singular the matters in issue in this case are submitted to the court for trial, and after hearing the evidence, the court doth find :   That on the twelfth day of January, A. D., 1883, plaintiff and defendant entered into a co-partnership for the purpose of dealing in jewelry, etc., in the city of Carthage, Jasper county, Missouri, as equal partners ; that plaintiff put into said business his stock of jewelry, which he had formerly kept at Peirce City, Mo., amounting to the sum of five thousand, five hundred and sixty dollars ($5,560), for one-half of which defendant was to pay, and did pay, plaintiff ; that in addition thereto, plaintiff put into said business old coin of the value of two hundred dollars ($200) ; that defendant put into said business the one-half of the original stock for which he paid plaintiff the amount of twenty-seven hundred and eighty dollars ($2,780), and also put in fourteen hundred dollars ($1,400) cash.   The court further finds that on the twenty-sixth day October, 1883, the defendant, having obtained from the plaintiff an instrument of writing, purporting to convey to him all of plaintiff's interest in said stock for the purposes in said instrument mentioned, assumed to, and did take possession of all of said stock to the exclusion of plaintiff, and continued to run said business in his own name and for his own benefit until he finally closed out said business.   The court further finds that at the time defendant took possession of said stock, on the twenty-sixth day of October, 1883, he took an invoice of the same amounting to the sum of ten thousand dollars ($10,000), and accounts belonging to said firm amounting to three hundred dollars ($300), and that he afterwards

paid debts due and owing by said firm to the amount of six thousand and seven hundred dollars ($6,700). The court finds that defendant put into said business in excess of what plaintiff had put in, the sum of six hundred dollars. The court, therefore, finds that defendant received the sum of thirteen thousand dollars ($13,000) in stock and accounts, as aforesaid, and that he put into said business and paid debts of the firm as aforesaid, in the sum of ten thousand eight hundred and eighty dollars ($10,880), leaving the sum of twenty-one hundred and twenty dollars ($2,120) as the excess of the amount taken by him as aforesaid. The court finds that the instrument of writing, executed by plaintiff as aforesaid to defendant, did not create a dissolution of the partnership, and that defendant has received, in excess of his just rights in the premises, the sum of twenty-one hundred and twenty dollars ($2,120) more than his just share, one-half of which belongs to plaintiff. It is, therefore, considered and adjudged and decreed by the court, that the co-partnership be dissolved, and that plaintiff have and recover of and from said defendant, the sum of one thousand and sixty dollars ($1,060), the same being one-half of the amount taken, had and received by defendant out of the assets of said co-partnership business, over and above his just share, and it is further adjudged that plaintiff recover of defendant the costs of this suit, and that execution issue to enforce this judgment."

I. The first ground of the defendant's appeal is, that the instrument under which plaintiff conveyed his interest in the partnership property to defendant had for its operative effect a dissolution of the partnership. The principle is elemental in the law of partnership that an absolute and unconditional sale by one partner of his interest in the partnership property to a stranger *ipso facto* operates as a dissolution of the co-partnership relations. Story on Part. (7 Ed.) secs.

207, 208; *Heath v. Lauson*, 4 B. & A. 175; *Spaunhorst v. Link*, 46 Mo. 197. But by reference to this instrument it will be seen that it is nothing more than a chattel mortgage executed by plaintiff to defendant to secure certain advances therein mentioned. The evidence *aliunde* conclusively shows that the intention of the parties to it was that it should have the effect only of a mortgage to secure past and future advances. The question, then, is, what was the effect of giving such mortgage upon the partnership, if any? In *Dupont v. McLaran*, 61 Mo. 502, the supreme court of this state, through Judge HOUGH, who delivered its opinion, say, "that the conveyance made by Saxton of his interest in the firm of McLaran, Saxton & Williams was not an absolute and unconditional transfer of the same and did not have the effect of dissolving the co-partnership, nor was said instrument intended to have that effect. It is evident from the language employed that it contemplates a continuance of Saxton's interest in the firm and a possible subsequent dissolution by the acts of the parties themselves before the extinguishment of the plaintiff's claim. It amounted to nothing more than a mortgage of Saxton's interest in the firm and except in so far as it limited and restrained the disposition of his portion of the profits arising in the business during the continuance of the partnership and of the interest remaining to him after the dissolution." The plaintiff, in the case under consideration, having all the powers of a partner, and having only pledged, for the payment of said advances made and to be made by defendant, his interest in the partnership property, he had an undoubted right to be consulted as to the management of the business of the partnership, and to have access to the partnership accounts, so that he might be informed of the condition of the co-partnership business. It results from these considerations that the execution of said mortgage did not have the effect to dissolve the partnership.

II.   The defendant further contends that, inasmuch as the plaintiff's suit was commenced eight days after the execution of the mortgage to defendant, and before the ninety days provided therein for the redemption had expired, that the plaintiff's action for an account was premature.   The conduct of the defendant in denying plaintiff's rights as a partner, subject to the limitations already mentioned, and his total exclusion by defendant from any participation in the partnership business, with other acts of gross misconduct stated in the evidence, authorized the bringing of his action. No reason is conceived why plaintiff should have been required to delay ninety days before he invoked the interference of a court of equity in his behalf.   In cases where gross mismanagment or abuse of authority, or gross want of good faith and the like, such as is and must be productive of serious and permanent injury to the success and prosperity of the business of the partnership, or such as renders it impracticable to be carried on, or is positively ruinous to its interests, courts of equity will promptly interfere and decree a dissolution.   Story on Part. sec. 288 ; Story Eq. Jur. sec. 673 ; *Cottle v. Leach*, 35 Cal. 434 ; *Maher v. Bull*, 44 Ill. 97.

III.   It is insisted by defendant that the circuit court erred in its refusal to permit him to show the amount actually realized by him out of the sale of the partnership property.   With this action of the court we are not quite satisfied.   Equity enjoins upon trustees and others occupying a fiduciary relation the obligation to use reasonable care and diligence in the discharge of their functions.   This duty is quite comprehensive and extends to the entire range of their conduct.   The defendant's offer did not go far enough.   Something more was necessary.   He should have coupled with his offer a showing of reasonable care and diligence.   There may have been a wide difference between the amount actually realized from the sale of said partnership

property and the amount which might have been realized by the use of reasonable care and diligence in connection therewith. *Moore v. Huntington*, 17 Wall. 427; Story Eq. Jur. sec. 1275; Pomeroy's Eq. Jur. secs. 1066, 1070, 1088.

IV. The defendant further complains that the circuit court erred in its refusal to permit him to show the amount of expenses paid by him in closing out the partnership business. This refusal was erroneous. The rule is, that while a partner is not entitled to compensation for his trouble as a matter of law, he is entitled to charge the partnership with sums *bona fide* expended in conducting the business thereof. Lindley on Part. 777.

V. The defendant offered to show by witnesses the value of the Peirce City stock of goods, which offer was rejected by the circuit court, and which he assigns as error. The defendant's answer affirmatively pleaded in avoidance of plaintiff's action a full and complete settlement between them of all their co-partnership affairs which covered and included the controversy arising out of the transaction respecting the Peirce City stock of goods. Defendant's offer of evidence, going behind this alleged settlement to establish a fact that was embraced in it, was properly rejected.

VI. There is error appearing upon the face of the record of the finding and decree of the circuit court. The record recites that the court found that the defendant received goods of the partnership, as per invoice, amounting to ten thousand dollars, and accounts amounting to three hundred dollars. The court erroneously found, as appears by the record, that these two sums aggregate thirteen thousand dollars instead of $10,300. The amount of $10,880 which the court found had been paid out by defendant is a greater sum than the $10,300 received by him, so that it is apparent that the decree which orders defendant to pay plaintiff the sum of $1,060 is erroneous.

The Chicago, S. F. & Cal. Ry. Co. v. Vivian.

There are other errors complained of, but in view of the disposition we shall make of the case, and of the further fact that the same are not likely to occur again on a re-trial, it is unnecessary to notice them here.

The other judges concurring the decree is reversed and the cause remanded.